IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RICARDO DELGADO,

    Plaintiff,

v.                                                            No.15-cv-196 JCH/GJF

LIBERTY MUTUAL FIRE INSURANCE
COMPANY and FARMERS INSURANCE
COMPANY OF ARIZONA,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Liberty Mutual Fire Insurance Company's ("Liberty Mutual") Second Motion ("Motion") for Summary Judgment. (Doc. 32). The Motion presents the question of whether Georgia or New Mexico law governs Mr. Delgado's claim for uninsured motorist ("UM") coverage and whether Liberty Mutual rejected such a claim in bad faith. Having reviewed the motion, briefs, evidence, and relevant law, the Court concludes that the motion should be granted.

**I.    BACKGROUND**

This is an insurance coverage dispute arising out of a motor vehicle accident in July 2008. In the course and scope of Mr. Delgado's employment with United Parcel Service Ground Freight, Inc. ("UPS Freight"), he was operating a 2002 International tractor truck with two trailers, traveling eastbound on Interstate 10 near mile marker 6.6 in Hidalgo County, New Mexico. (*See* Compl. ¶ 7, Doc. 1-3). "[S]uddenly and without warning, a driver ('phantom driver') … passed him on the left, veered sharply in front of him and cut him off," causing Mr. Delgado to suddenly steer to the left to avoid a collision and lose control. (*Id*. ¶ 8). The tractor

truck and trailers overturned. (*Id.*) Mr. Delgado sued Liberty Mutual, UPS Freight's automobile liability insurer, seeking a declaratory judgment that it is liable for uninsured motorist ("UM") coverage.

<u>The Policy</u>

According to Mr. Delgado's Complaint, "Plaintiff and Liberty Mutual were insured and insurer respectively under a valid and binding contract for insurance, policy number A12C21092036028" ("the Policy"). (*Id.* ¶ 4) Although Mr. Delgado correctly identifies the Policy number, the Policy was in fact between Liberty Mutual and 16 UPS subsidiaries, including UPS Freight. Only a single UPS subsidiary, however, was listed as the named insured on the Policy. (Policy, Doc.32-4 at 2; Def.'s Resp., Doc. 33-4 at 2) That subsidiary is called UPS Supply Chain Solutions, Inc. ("UPS Supply"), and its name and Georgia address appear on the Policy's declarations page. (Policy, Doc. 32-4 at 2) However, an endorsement accompanying the Policy states that "the term Named Insured includes in addition to the person or organization named in Item 1 [*i.e.* UPS Supply] of the Declarations the following …." (Def.'s Resp., Doc. 33-4 at 2) The endorsement then lists 16 other UPS subsidiaries, including UPS Freight, Mr. Delgado's employer. (*Id.*) Thus, the endorsement makes clear that UPS Freight is a named insured on the Policy, even if only UPS Supply's name and Georgia address alone appeared on the declarations page.[1] The Policy covered losses for the period from January 1, 2008 to January 1, 2009. (Def's Sur-Resp., Doc. 69-2 at 4)

Liberty Mutual first issued the Policy to UPS in 2005. (Pl.'s Interrog. No. 8, Doc. 67-3 at 5-6) Liberty Mutual's practice was to automatically renew the Policy on January 1 of each year.

---

[1] Mr. Delgado contends that there is a factual issue regarding whether the Policy applied to UPS Freight. According to Mr. Delgado, because only UPS Supply and its Georgia address appear on the Policy's declarations page, there is a genuine question regarding whether the Policy applied to UPS Freight. The Court does not credit Mr. Delgado's contention as true, because an endorsement to the Policy, which Mr. Delgado submitted in the record, makes clear that UPS Freight and numerous other UPS subsidiaries are deemed named insureds on the Policy.

2

(Chevere Dep. at 93: 15-16, Doc. 69-1 at 9) Also each year Liberty Mutual would assess the risk of insuring UPS. (*Id.* at 103:20-104:1) UPS, the parent company, was not a named insured on the Policy. (*Id.* at 82:22-83:1) It had its own separate liability policies with Liberty Mutual. (*Id.* at 82:18-21) But as a parent company it could purchase insurance on behalf of its subsidiaries, as it did for the 16 subsidiaries covered by the Policy. (Netherly Aff. ¶ 15, Doc. 32-1 at 3) Liberty Mutual delivered the Policy to UPS's headquarters in Georgia.[2]

The Renewal Agreement

Throughout February and March 2008, UPS and Liberty Mutual negotiated a "Renewal Agreement" related to the Policy. (Pl.'s Sur-Reply, Doc. 68 at 1 -7) The Renewal Agreement was not a contract for insurance itself. (Chevere Dep. at 40:3-10, Doc 67-1) Rather, its purpose was to outline UPS's and Liberty Mutual's pricing negotiations for various insurance products that Liberty Mutual sold to UPS and its subsidiaries. (*Id.* at 50:6-9; Doc. 68 at 3) UPS staff negotiated the Renewal Agreement from its offices in Georgia. Patrick Power, UPS's then-Senior Risk Manager, stated in an affidavit that he was personally involved in procuring the Policy while in Georgia. (Power Aff. ¶ 10, Doc. 44-2) He signed paperwork relating to the Renewal Agreement, such as what UPS would post as collateral and how much it would pay Liberty Mutual in premiums. (Pl.'s Sur-Reply, Doc. 67-3 at 2) Once negotiations were closed, another UPS employee named Mike Fenlon, UPS's Director of Risk Management, signed the Renewal Agreement in his Georgia office. (*Id.*) A few weeks later, in April 2008, Liberty Mutual

---

[2] Mr. Delgado contends that there is a genuine fact issue regarding whether Liberty Mutual truly delivered the Policy to UPS because one UPS employee stated in an affidavit that the Policy was sent to Alpharetta, (an Atlanta suburb) while another said it was sent to his personal attention in Atlanta, but that he was not sure. The Court does not resolve these mildly conflicting statements in Mr. Delgado's favor because whether the Policy was sent to Atlanta or an Atlanta suburb, the operative fact is that it was sent to Georgia, and Mr. Delgado put forward no affirmative evidence refuting this.

sent to UPS in Georgia enclosures of various insurance policies that were the subject of the Renewal Agreement, including the Policy at issue. (*Id*. Doc. 68 at 8-9)

Liberty Mutual contends that the Renewal Agreement executed the Policy because if UPS had not signed the Renewal Agreement, then Liberty Mutual would have canceled the Policy. (Pl.'s Interrog. No. 3; Doc. 67-3 at 3) However, the record evidence suggests otherwise, indicating instead that Liberty Mutual would automatically renew the Policy on January 1 (whether or not the Renewal Agreement was signed), and provide coverage in the interim while the parties negotiated and finalized the Renewal Agreement. (Chevere Depo. at 66:22-24, 93:11-16, Doc. 69-1) As Jeannette Chevere, a Liberty Mutual underwriter explained, "we go ahead and issue the policy on 1/1 in good faith" because of Liberty Mutual's and UPS's longstanding relationship. (*Id.* 93:11-16) Consistent with that practice, Liberty Mutual renewed the Policy on January 1, 2008 and then it and UPS signed the Renewal Agreement nearly two-and-a-half months later, in March 2008. (*Id*.; Def.'s Sur-Reply, Doc. 68 at 7) Ms. Chevere conceded that there was no firm date by which UPS had to sign the Renewal Agreement. (Chevere Depo. at 93:11-16, 94:4-10, Doc. 69-1)

In other words, Ms. Chevere's conflicting statements reveal that Liberty Mutual would have canceled the Policy if UPS had not signed the Renewal Agreement – but that signing the Renewal Agreement was not necessarily a precondition to providing UPS coverage. These conflicting statements are resolved in Mr. Delgado's favor and the Court thus credits as true Mr. Delgado's contention that the Renewal Agreement did not execute the Policy because Liberty Mutual's practice was to provide UPS coverage under the Policy even if the Renewal Agreement remained unsigned.

<u>U/M Waiver Forms</u>

In December 2007, right before the Policy's January 1 effective date, Mr. Power signed UM rejection forms associated with the Policy. (Power Aff. ¶ 7, Doc. 44-2 at 2) Just as UPS could enter into insurance contracts on behalf of the 16 subsidiaries named on the Policy, UPS could reject insurance on their behalf too. (Netherly Aff. ¶ 15, Doc. 32-1 at 3) Mr. Power stated in an affidavit that his job was to reject UM coverage for UPS and its subsidiaries, and in that role he personally signed UM/UIM rejection forms related to the Policy for multiple states, including forms for Georgia and New Mexico. (Power Aff. ¶¶ 7, 13 Doc. 44-2 at 2-3) On the Georgia rejection form, a box is checked next to the statement "I wish to reject Uninsured Motorist Coverage." (Def.'s Mot., Doc. 32-5 at 2) Mr. Power signed the form in his Georgia office. (Power Aff. ¶ 7, 13 Doc. 44-2 at 2) Although only UPS Supply appeared as the named insured on the UM rejection form, the rejection form was effective as to all subsidiaries on the Policy, including UPS Freight, Mr. Delgado's employer. (Netherly Aff. ¶ 15, Doc. 32-1 at 3) [3]

On the same day, Mr. Power signed a similar UM rejection form for New Mexico. (Pl.'s Resp., Doc 33-7) Liberty Mutual admitted in a request for admission that its New Mexico UM rejection is not compliant with the New Mexico Supreme Court's decision in *Jordan v. Allstate Ins. Co.*, 2010-NMSC-051, 149 N.M. 162, 245 P.3d 1214 (2010), which requires insurers to provide insureds UM rejection forms that provide insureds different coverage options and their relative costs. (Pl.'s Sur-Reply, Doc. 67-2 at 5) *Jordan* was decided in 2010, after Mr. Power

---

[3] Mr. Delgado contends that there is a fact issue about whether UPS Supply, the entity listed on the UM waiver form, could waive UM coverage on behalf of UPS Freight. (*See* Pl.'s Resp. at 18, Doc. 33). But UPS Supply did not waive UM coverage, UPS did. Liberty Mutual's uncontested evidence establishes that UPS is authorized to reject UM coverage for its subsidiaries.

Mr. Delgado also contends that since UPS Supply alone appears as the "named insured" on UM rejection form, there is a fact question about whether the form applied to UPS Freight. Again, an endorsement to the Policy – which both parties submitted in the record – states that the term "named insured" includes UPS Freight. The Court therefore does not credit Mr. Delgado's argument since it is not supported by the record.

signed the New Mexico UM rejection form. However, because of *Jordan*'s retrospective application, its requirements would apply to the 2007 waiver.

In August 2008, after Mr. Delgado's accident but before filing this lawsuit, his lawyer wrote UPS to inquire about UM coverage. (Pl.'s Resp., Doc. 33-2 at 1) UPS's lawyer wrote back that UPS rejected UM coverage, and UPS's lawyer attached a copy of the New Mexico UM rejection that Mr. Power signed. (*Id.*)

## II. PROCEDURAL BACKGROUND

Mr. Delgado filed suit in March 2015 asserting the following counts against Liberty Mutual and Defendant Farmers Insurance Co. of Arizona ("Farmers"), Mr. Delgado's automobile liability insurer: (III) a declaratory judgment that Defendants are liable for UM coverage; (IV) bad-faith refusal to settle and pay Mr. Delgado's claims; (V) violations of the New Mexico Insurance Code; and (VI) violations of the New Mexico Unfair Practices Act. The Court previously granted Liberty Mutual's first motion for summary judgment (Doc. 31) on Counts V and VI of Mr. Delgado's Complaint, dismissing as time-barred his claims under New Mexico's Insurance Code and Unfair Practices Act. (*See* Doc. 55)

Following the parties' briefing of the current Motion, Mr. Delgado filed a motion for discovery and motion for leave to file a surreply, arguing that Liberty Mutual's reply contained new evidence to which Mr. Delgado did not have a fair opportunity to respond or investigate through discovery, which the Court granted. Mr. Delgado filed a sur-reply and Liberty Mutual filed a sur-response.

Defendant Farmers opposes the Motion. All of Mr. Delgado's counts against Farmers remain in this case. (*See* Doc. 55)

## III. LEGAL STANDARDS

*Summary Judgment*[4]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. *Id.* at 248-49. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324. In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S. at 255. "[I]n resisting the motion for summary judgment, [the nonmoving party] may not rely on mere allegations, or denials,

---

[4] Mr. Delgado argues that Liberty Mutual's choice-of-law challenge is an affirmative defense, entitling it to summary judgment only if its evidence is "so powerful that no reasonable jury would be free to disbelieve it." (Pl's Sur-Reply at 15, Doc. 67) (quoting *Leone v. Owsley*, 810 F.3d 1149, 1153-54 (10th Cir. 2015). However, the cases Mr. Delgado relies on for this proposition did not allocate the summary judgment burdens in the manner he describes. *See e.g. Ennis, Inc. v. Dunbrooke Apparel Corp.*, 427 S.W.3d 527, 530 (Tex. App. 2014) (stating that when the "movant for summary judgment seeks to have the law of another state applied" the "usual summary-judgment standards" apply). The Court applies the usual summary judgment standards described in *Ennis Inc.* and above.

contained in its pleadings or briefs. Rather, [the nonmoving party] must set forth specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations." *Trainor v. Apollo Metal Specialties, Inc.* 318 F.3d 976, 982 (10th Cir. 2002).

*Choice-of-Law*

This is a diversity case. In such a case, the court applies the substantive law of the forum state (*i.e.* New Mexico), including its choice-of-law rules. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). "New Mexico follows the choice-of-law doctrine of *lex loci contractus* – the law of the place of contracting – to issues involving contract interpretation, including insurance policies."[5] *Saveraid v. St. Farm Ins. Co.*, 597 Fed.Appx. 492, 494-95 (10th Cir. 2015). Under that doctrine, "courts look to the law of the place where the contract was consummated." *St. Farm Mut. Ins. Co. v. Conyers*, 1989-NMSC-071, ¶ 15, 784 P.2d 986, 991. "A contract is consummated where the last act necessary for its formation was performed" which can be where the last signature on the contract is affixed, *see id.*, or where the insurance policy was issued. *See Wilkeson v. St. Farm Mut. Ins. Co.*, 2014-NMCA-077, ¶¶ 2, 5, 329 P.3d 749, 750.

There is a "narrow exception" to the *lex loci contractus* doctrine. *See Saveraid*, 597 Fed.Appx. at 495. New Mexico courts will apply their own law "if applying the law of another state would result in a violation of fundamental principles of justice of New Mexico." *Demir v. Farmers Tx. Cnty. Mut. Ins. Co.*, 2006-NMCA-091, ¶ 8, 140 P.3d 1111, 1114. "It is said that

---

[5] The *lex loci contractus* rule comes from the Restatement (First) of Conflict of Laws § 311. Mr. Delgado urges the Court to apply the significant relationship test from the Restatement (Second) of Conflicts of Law because the New Mexico courts have at times applied that test, such as when the *lex loci contractus* rule is unworkable. *See e.g. Ferrell v. Allstate Ins. Co.*, 2008-NMSC-042, ¶ 56, 119 P.3d 1156 (stating that the Restatement Second approach "is a more appropriate approach for multi-state contract class actions."). The Court will apply the *lex loci contractus* rule because it is workable in this case and because, as one court in this District has noted, for almost 30 years "case law in the Tenth Circuit and New Mexico have [sic] held that New Mexico applies *lex loci contractus*," *Sarkar v. Hartford Ins. Co. of the Midwest*, CV 12-0861 WPL/LAM, 2013 WL 12085168 *5 (D.N.M. Jul. 12, 2013).

courts should invoke this public policy exception only in extremely limited circumstances." *Reagan v. McGee Drilling Corp.*, 1997-NMCA-014, ¶ 9, 933 P.2d 867, 869.

IV. **ANALYSIS**

A. **Liberty Mutual has met its summary judgment burden to show that Georgia law applies to the Policy because the Policy was issued in Georgia, while Mr. Delgado has failed to demonstrate a material fact issue indicating that the Policy was formed or issued in New Mexico.**

Mr. Delgado contends that three genuine issues of material fact prevent the Court from granting Liberty Mutual's Motion. First, Mr. Delgado contends that there is a genuine issue about what events consummated the 2008 iteration of the Policy. For choice-of-law purposes, New Mexico courts hold that "[a] contract is consummated where the last act necessary for its formation was performed" which can be where the last signature on the contract is affixed or where it was issued. Liberty Mutual has zeroed-in on UPS Director of Risk Management Mike Fenlon's signature on the Renewal Agreement in Georgia, arguing that his affixed signature formed the Policy. Mr. Delgado argues – and the Court credits as true – that signing the Renewal Agreement did not form the Policy because Liberty Mutual provided UPS coverage even if the Renewal Agreement went unsigned. Mr. Delgado argues that since there are no record facts about what events formed the 2008 iteration of the Policy – i.e. who signed what and where – summary judgment for Liberty Mutual is unwarranted.

The Court disagrees agree with this latter contention. Even crediting Mr. Delgado's version as true, the claimed factual dispute he identifies is immaterial because New Mexico courts do not look exclusively at where a contract was signed in conducting a choice-of-law analysis. True, New Mexico courts have stated that "[a] contract is made at the place here the last signature is affixed." *Conyers*, 1989-NMSC-071 at ¶ 15. However, both parties have overlooked New Mexico case law holding that an insurance contract is governed by the state's law of the

9

contract's issuance. *See Wilkeson*, 2014-NMCA-077, ¶¶ 2, 5 (stating that "California law would govern as to issues pertaining to the insurance policies," because the "policies were *issued* to Plaintiff while she resided in California, and the policy covering the car in the accident, the only policy of record, lists her California address.") (emphasis added). Liberty Mutual has submitted uncontroverted record evidence that it sent the Policy to UPS Supply in Georgia; that the Policy applies to UPS Freight; and that UPS's staff in Georgia had authority to enter into contracts on behalf of UPS Freight. Mr. Delgado, in contrast, has submitted no record evidence that any one of these events occurred in New Mexico. The Court therefore holds that even if the Renewal Agreement did not consummate the Policy, there is no material issue about its place of issuance: Georgia. The Policy's issuance there is sufficient to grant summary judgment to Liberty Mutual, as it determines which state's law applies. However, the Court will address the remainder of Mr. Delgado's purported fact disputes.

Second, Mr. Delgado contends that there is a genuine issue regarding whether the Court's choice-of-law analysis must center on the 2005 version of the policy, or its 2008 iteration in the record. According to Mr. Delgado, since the Policy was first issued in 2005, the choice-of-law analysis must center on the 2005 iteration of the Policy. Mr. Delgado argues that Liberty Mutual is not entitled to summary judgment because it "has put forth no evidence regarding the issuance of the policy in 2005 … no evidence regarding who signed the documents that were necessary to issue the 2005 policy, who negotiated the terms of the 2005 policy, or what constituted the last necessary act to formulate and issue the 2005 policy." Mr. Delgado also draws a distinction between a new contract for insurance and a renewal. He argues that a renewal is governed by the state's law where the original policy was formed, relying on the New Mexico Supreme Court's statement that "a reinstatement of insurance continues the original policy in force and is not

executing a new contract of insurance." *In re White's Estate*, 1939-NMSC-019, ¶ 9, 89 P.2d 36, 37 and *Miller v. Mut. Benefit Health & Accident Ass'n of Omaha*, 1966-NMSC-122, ¶¶ 7-8, 415 P.2d 455, 457-58. Mr. Delgado argues that since the 2008 iteration of the Policy is merely a renewal, it is governed by the law of the state where it was formed, which is unknown from the record.

In response, Liberty Mutual argues that the 2008 iteration of the Policy is a new contract, formed in Georgia, governed by Georgia law, and only the 2008 iteration matters for choice-of-law purposes. According to Liberty Mutual, "although there is continuity between successive policy contracts, each renewal is a separate contract and is to be treated as such in this respect." (quoting *Gov't Emp. Ins. Co. v. U.S.,* 400 F.2d 172, 174-75 (10th Cir. 1968)). Liberty Mutual identifies a number of factors that it contends make the 2008 iteration a new contract, including new endorsements, premiums and UM waivers corresponding to the 2008 iteration, as well as the Policy's distinct duration and identification number.

The Court holds that Liberty Mutual has submitted sufficient evidence demonstrating that the 2008 iteration in the record is a new contract. The record contains evidence that: Liberty Mutual renews the Policy on January 1 of each year; with each new issuance the Policy had a distinct identification number, duration, and premiums reflecting Liberty Mutual's risk of insuring UPS for the respective year; UPS was a named insured on the 2008 iteration of the Policy; UPS purchases and rejects insurance on behalf of UPS Freight, and that the Policy covered losses for the Policy's duration. In addition, Liberty Mutual submitted record evidence that a number of events related to the Policy occurred in Georgia, such as the following: UPS negotiated the Renewal Agreement in Georgia; UPS signed the Renewal Agreement in Georgia; UPS signed UM waiver forms in Georgia; Liberty Mutual sent the 2008 Policy to UPS in

Georgia. The Court finds that Liberty Mutual has sufficiently demonstrated that there is no genuine fact issue regarding whether the 2008 iteration is a new contract. Mr. Delgado – the burden having shifted to him to respond with evidence of a claimed dispute – did so by pointing to the record and asserting that Liberty Mutual "put forth no evidence regarding the issuance of the policy in 2005," mistakenly suggesting that it was Liberty Mutual's burden to do so. Mr. Delgado cannot merely claim that Liberty Mutual failed to meet its burden without putting forth some affirmative evidence of his own. Mr. Delgado's reliance on *In re White's Estate* and *Miller* is insufficient to discharge his summary judgment burden, because those cases involved the question of which state's law governed an insurance contract that was cancelled and then reinstated – a situation far different from this case. The Court holds that Liberty Mutual has submitted sufficient evidence in the record demonstrating that the 2008 iteration is a new contract. The Court also notes that Mr. Delgado made the 2008 iteration of the Policy the subject of this lawsuit, calling it a "valid and binding contract" entitling him to UM coverage.

Third, Mr. Delgado contends that there is a fact question regarding whether the Policy was issued at all because Liberty Mutual sent UPS the Policy in April, nearly three months after its January 1 effective date. Mr. Delgado also points to two UPS employees' ambivalent statements about whether the Policy was issued to Atlanta or an Atlanta suburb, and to Ms. Chevere's deposition statement that Ms. Chevere lacked personal knowledge about the April 2008 policy enclosures as support of his claimed factual dispute. Mr. Delgado contends that "[t]aken together, this evidence creates doubt about whether the 2008 renewal was 'issued' at all." The Court fails to see how. More critical than when the Policy was issued is where it was issued: Georgia. As described above, Liberty Mutual has submitted evidence that the Policy was sent to UPS Supply's Georgia address and that the Policy applied to UPS Freight. Mr. Delgado

12

has not disputed the Policy's authenticity. He has submitted no affirmative evidence or pointed the Court to any case law suggesting that the Policy's transmission to Georgia after its effective date casts doubt on whether it was issued at all.

In sum, the Court holds that Mr. Delgado's claimed disputes do not prevent the Court from applying New Mexico's choice-of-law rules. The relevant insurance policy governing this dispute is the 2008 iteration in the record, which Mr. Delgado called a valid and binding contract. Under *lex loci contractus* the applicable law governing the 2008 Policy is Georgia, because UPS purchased the Policy there; Liberty Mutual and UPS negotiated the Policy there, as evidenced by the Renewal Agreement; and because Liberty Mutual then sent the Policy to UPS Supply's Georgia address, among other things. Notably, Mr. Delgado has not represented that a single one of these events occurred in New Mexico.

**B.** **New Mexico's UM coverage and rejection statute does not apply**

Mr. Delgado contends that New Mexico's UM/UIM coverage and rejection statute, NMSA 1978, § 66-5-301 (1983), applies in this case, and that because Liberty Mutual admitted that its New Mexico UM waiver is invalid under *Jordan*, it must be reformed to provide him UM coverage. As proof that § 66-5-301 applies, Mr. Delgado points to a letter from UPS's lawyer to Mr. Delgado's lawyer stating that UPS rejected UM coverage in New Mexico, with a copy of the New Mexico UM rejection attached. Mr. Delgado argues the letter reveals that "Liberty Mutual itself considered this to be a New Mexico insurance policy … [i]n fact, Liberty Mutual's initial rejection of coverage was based on the fact that it (incorrectly) believed that it had a valid New Mexico UM waiver."

The Court rejects Mr. Delgado's contentions for numerous reasons. First, § 66-5-301 does not apply. Section 66-5-301 states in pertinent part that "[n]o motor vehicle or automobile

liability policy … shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided … for injury to or destruction of property as" as described further in the statute. Here, the Policy was not delivered or issued for delivery in New Mexico. Nor was the 2002 International that Mr. Delgado drove registered or principally garaged in New Mexico. Georgia law governs the manner of a valid UM rejection, and the applicable UM waiver form is for Georgia, not its New Mexico counterpart. *See Saveraid v. St. Farm Ins. Co.*, 597 Fed.Appx. 492, 498 (10th Cir. 2015) (explaining that "[f]or insurance policies *originating in its state*, New Mexico requires that an insured's" UM/UIM coverage comply with *Jordan*) (emphasis added). Second, the Court rejects Mr. Delgado's inaccurate assertion that Liberty Mutual waived UM coverage and "considered this to be a New Mexico insurance policy." This is factually incorrect: Liberty Mutual did not reject UM coverage, UPS did. The Court holds that New Mexico law does not govern the Policy or its corresponding waivers.

## C. Georgia law applies to the Policy, and under Georgia law UPS's UM rejection was valid.

Georgia's UM/UIM coverage statute states in pertinent part that

> No automobile liability policy or motor vehicle liability policy shall be issued or delivered in this state to the owner of such vehicle or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle then principally garaged or principally used in this state unless it contains … provisions undertaking to pay the insured damages … sustained from the owner or operator of an uninsured motor vehicle

GA. CODE ANN. § 33-7-11(a)(1).

The statute further provides that an insured may decline UM coverage where "any insured named in the policy [] reject[s] the minimum coverage in writing. *Id.* § 33-7-11(a)(3). "Georgia law requires that an insured under an automobile policy be given the option of [1]

rejecting [UM/UIM] motorist coverage, [2] selecting minimum coverage or [3] selecting coverage up to the limits of liability of the policy." *Georgia Farm Bureau Mut. Ins. Co. v. North*, 714 S.E.2d 428, 431 (Ga. Ct. App. 2011). "There are no formal, statutory requirements or appellate court decisions governing how and in what manner the insurer must offer the available options for uninsured motorist coverage." *Id*. Similarly, "there are no formal requirements governing the manner in which such coverage must be rejected, beyond requiring that the rejections must be in writing." *Id. See also Nat'l Union Fire Ins. Co. v. Johnson*, 357 S.E.2d 859, 860 (Ga. Ct. App. 1987) (stating that "the only statutory requirement for rejection of uninsured motorist coverage" is that it be in writing).

The Georgia UM rejection form complies with § 33-7-11 because it provided UPS all three UM/UIM coverage options that an insurer must offer an insured under Georgia law. As described in *Georgia Farm Bureau*, an insurer must offer the insured the option of rejecting UM coverage, selecting minimum coverage, or selecting coverage up to the policy's limits. The UM rejection form in the record offers all three options, plus more. UPS selected the box "I wish to reject Uninsured Motorist Coverage." The form is in writing, thus complying with § 33-7-11's "only statutory requirement," *Nat'l Union Fire Ins. Co*. The Court is further convinced that the UM rejection form was valid under case law interpreting § 33-7-11. In *Blalock v. Southern Ins. Co.*, 349 S.E.2d 32, 33 (Ga. Ct. App. 1986), for example, the court held that a checked "rejection" box, coupled with the signature of the insured, sufficiently rejected UIM coverage. Similarly, in *Bowman v. Continental Ins. Co.*, 229 F.3d 1131, 1131 (4th Cir. 2000) held that the insured validly rejected UM coverage when it checked a box titled "I reject uninsured/underinsured motorist bodily injury and property damage coverage entirely" and signed the form. Like these cases, UPS marked a box indicating that it wanted to reject UM

coverage, and thus rejected Georgia UM coverage on behalf of the Policy's named insureds including UPS Freight.

D. **Applying Georgia law to the Policy does not conflict with fundamental New Mexico principles of justice**

"To overcome the rule favoring the place where a contract is executed, there must be a countervailing interest that is fundamental and separate from general policies contract interpretation." *Demir v. Farmers Tx. Cnty. Mut. Ins. Co.*, 2006-NMCA-091 ¶ 8. In the context of insurance policies in particular, New Mexico courts are routinely asked to set aside *lex loci contractus* and reject policy exclusions contained in out-of-state insurance contracts that violate New Mexico public policy. *See e.g., St. Farm Mut. Auto Ins. Co. v. Ballard*, 2002-NMSC-030, ¶¶ 4, 11-14, 54 P.3d 537 (applying New Mexico law to Georgia policy exclusion eliminating coverage for insured's family members); *Sandoval v. Valdez*, 1978-NMCA-016, ¶¶ 17-23, 580 P.2d 131 (applying New Mexico law to a Colorado policy containing a "time to sue provision" that limited the insured's time to bring a lawsuit). In *Demir* – a case that is factually similar to this case – the plaintiff purchased a Texas issued policy that contained an exclusion for UM coverage for accidents not involving physical contact with an uninsured vehicle. *Demir,* 2006-NMCA-091, ¶ 3. The plaintiff, a Texas resident, was driving in New Mexico when he swerved to avoid another vehicle, resulting in an accident but no physical contact with the phantom driver. *Id*. ¶ 2. Because of the policy exclusion requiring physical contact with the uninsured car, the insurer refused to afford the plaintiff UM coverage. *Id*. ¶ 3. On appeal, the court set aside *lex loci contractus* and refused to apply Texas law or the exclusion because it placed a limitation on UM coverage not found in New Mexico's insurance statutes. *Id.* ¶ 23. As the court explained, the plaintiff "ha[d] purchased uninsured motorist coverage. We will not apply exclusions to his coverage that are prohibited by our statutes and by our public policy." *Id*.

One key element uniting *Demir*, *Ballard*, and *Sandoval* is that in those cases – unlike in this case – the insureds had purchased UM coverage in the first place. Here, the Court has already determined that UPS did not purchase UM insurance for the Policy's insureds, including UPS Freight. Mr. Delgado devoted little effort to presenting the Court with an alternative interpretation of *Demir*, although Liberty Mutual extensively relied on that case in its Motion. The Court concludes that no fundamental New Mexico principles of justice are implicated by applying Georgia law to the Policy because unlike the plaintiffs in *Demir*, *Ballard*, and *Sandoval* UPS never purchased UM coverage in the first place.

**E.     Bad-Faith Claim**

Liberty Mutual moves for summary judgment on Mr. Delgado's claim of bad faith, Count IV of Mr. Delgado's Complaint. According to Mr. Delgado, Defendants refused in bad faith to settle and pay his UM claim, gave unequal consideration to their interests over Mr. Delgado's interests, and breached their duty to act honestly, resulting in Mr. Delgado suffering numerous economic and non-economic damages. Liberty Mutual moves for judgment on the basis that Georgia law governs Mr. Delgado's bad faith claim, and that in order to be successful on a bad faith claim under Georgia law Mr. Delgado must show that Liberty Mutual breached the Policy in the first place. Liberty Mutual claims that because it did not breach the Policy when it rejected Mr. Delgado's UM claim, his bad faith claim necessarily fails. Liberty Mutual also suggests that this result would be identical if New Mexico law governs Mr. Delgado's bad faith claim because New Mexico law requires a showing that the policy afforded coverage in the first place.

The Court holds that Liberty Mutual is entitled to summary judgment on Count IV because it had no contractual duty to pay Mr. Delgado UM coverage under the Policy. Liberty Mutual is correct that Mr. Delgado's claim of bad faith fails under either New Mexico or

17

Georgia law. In *Charter Serv., Inc. v. Principal Mut. Life Ins. Co.*, 1994-NMCA-007, ¶ 17, 868 P.2d 1307, 1313, the court stated that "the concept of bad faith failure to pay in the insurance context does not arise unless there is a contractual duty to pay under the policy." Accordingly, in *Charter Serv. Inc.*, the insured, the employer, was precluded from pursuing a bad faith claim against the insurer because the insurance policy did not cover his injured employee. *Id.* ¶ 20.

A claim for bad faith under Georgia law is governed by GA. CODE ANN. § 33-4-6, which "provides that an insurer owes a bad faith penalty and reasonable attorney fees "[i]n the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith...." *BayRock Mortg. Corp. v. Chicago Title Ins. Co.*, 648 S.E.2d 433, 435 (Ga. Ct. App. 2007) (quoting § 33-4-6). "To prevail on a claim for an insurer's bad faith under [§ 33-4-6] the insured must prove: (1) that the claim is covered under the policy, (2) that a demand for payment was made against the insurer within 60 days prior to filing suit, and (3) that the insurer's failure to pay was motivated by bad faith." *Id*. Here, Mr. Delgado's claim fails on the first element because he has not demonstrated that his UM claim is covered under the Policy. Liberty Mutual is therefore entitled to summary judgment on Count IV of Mr. Delgado's Complaint.

## V. CONCLUSION

The Court concludes that Liberty Mutual it is entitled to summary judgment on Count III because the Policy is governed by Georgia law, and that under Georgia law UPS validly waived UM coverage on behalf of UPS Freight, Mr. Delgado's employer. Given that Liberty Mutual had no duty to provide Mr. Delgado UM coverage, the Court also determines that Liberty Mutual is

entitled to summary judgment on Mr. Delgado's claim of bad faith, Count IV, because Liberty Mutual had no duty to provide Mr. Delgado UM coverage.

Counts III and IV are asserted against all Defendants. Liberty Mutual's Motion states that Farmers opposes the Motion. The Court limits this Order to dismissing Counts III and IV against Liberty Mutual. All counts asserted against Farmers remain in the case.

**IT IS THEREFORE ORDERED that** Liberty Mutual Fire Insurance Company's Motion for Summary Judgment on Counts III and IV of Plaintiff's Complaint **(Doc. 32)** is **GRANTED**.

_____
**HON. JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE**